A07A1440. IN THE INTEREST OF S. D. H., a child.
(652 SE2d 570)

BERNES, Judge.

The mother of S. D. H. appeals the juvenile court's order finding the child deprived. She contends that there was insufficient evidence to support the deprivation finding. For the reasons that follow, we affirm.

On appeal from a deprivation order, we view the evidence in the light most favorable to the juvenile court's judgment to determine whether any rational trier of fact could have found clear and convincing evidence of deprivation. *In the Interest of A. B.*, 285 Ga. App. 288 (645 SE2d 716) (2007). We neither weigh evidence nor determine the credibility of witnesses. Id.

So viewed, the testimony and mental health records admitted at the deprivation hearing[1] reflect that at the time of the proceedings, the parents of S. D. H. were married and were both members of the United States Air Force stationed in Warner Robins. In March 2005, while pregnant with S. D. H., the mother went to the mental health clinic located on the military base for a psychological assessment. The mother reported that she had been depressed since March 2004, felt that she was unable to control her angry outbursts directed at other family members, and was concerned that her depression and uncontrolled anger problem would "cause her to lose the baby." Following her initial visit to the mental health clinic, the mother began receiving counseling for her depression and anger management problems from an Air Force psychiatrist and clinical psychologist, respectively.

S. D. H. was born on June 29, 2005. Over the ensuing months, the mother suffered from increasing depression and uncontrolled anger, resulting in ongoing confrontations with her husband and mother-in-law. During this period, the mother's psychiatrist diagnosed her

---

[1] OCGA § 24-3-18 provides an exception to the hearsay rule for written medical reports "which set forth, in story form, the author's assessment of the patient's history, examination, diagnosis, treatment, prognosis, or interpretation of tests or examinations, including the basis therefor." (Punctuation and footnote omitted.) *Lott v. Ridley*, 285 Ga. App. 513, 514 (1) (647 SE2d 292) (2007). The author of the report can be a medical doctor, psychologist, or professional counselor, among others. OCGA § 24-3-18 (a). OCGA § 24-3-4 provides an additional exception to the hearsay rule for statements made by or on behalf of a patient to a medical doctor or psychologist for purposes of examination or treatment. See *Allen v. State*, 247 Ga. App. 10, 12-13 (1) (543 SE2d 45) (2000); *Pirkle v. Hawley*, 199 Ga. App. 371, 377 (8) (405 SE2d 71) (1991).

with "major depressive disorder with postpartum onset" and placed her on psychotropic medication.

In November 2005, the mother was extremely angry when she arrived for her counseling session with her clinical psychologist, and she was unable to stop crying throughout the session. Because of her depression and inability to control her anger, the mother agreed to placement in a partial hospitalization program at Coliseum Psychiatric Hospital. But, less than a week later, the mother left the program prematurely because she felt that she was being "singled out" and "attacked" during group therapy. After leaving the program, the mother reported to her psychologist that she was still experiencing anger problems and had "fleeting thoughts of harming others."

In December 2005, the mother verbally threatened another Air Force member, which resulted in a military order forbidding any contact between them. Based on the threat, the Air Force also deemed the mother unsafe to carry a weapon and removed her from weapons duty.

On December 22, 2005, the mother arrived at the mental health clinic to see her psychologist without an appointment, extremely agitated and stating that her mother-in-law was going to kidnap S. D. H. The mother expressed concern that her mother-in-law was trying to break up her marriage and take S. D. H. away from her, and that her husband would not stand up to his mother. The mother again agreed to placement in the partial hospitalization program at Coliseum, where medical records describe her as "a nearly belligerent, hostile, angry young adult." In addition to her diagnosis of major depression, the mother was diagnosed with borderline personality disorder during this period. According to the mother's psychologist, borderline personality disorder is marked by an inability to maintain a stable mood and erratic personal relationships in which a patient goes back and forth between feeling extremely positive and extremely negative about the other person. The psychologist noted that the mother exhibited these characteristics.

In January 2006, the mother was released from the partial hospitalization program but continued to receive outpatient counseling for her depression and anger. In late March 2006, the mother-in-law arrived at the military base for a visit. After observing the mother's behavior, the mother-in-law contacted the group commander on base and expressed concern about the safety of her son and S. D. H. On March 31, 2006, a meeting was scheduled between the mother, father, mother-in-law, military personnel, and the mother's clinical psychologist to address these concerns. During the meeting, the mother began screaming, cried uncontrollably, pulled out her hair, repeatedly hit the father, and ran outside into the street waving her hands in the air. As a result of the mother's uncontrolled behavior,

the clinical psychologist decided to hospitalize the mother at Coliseum "for behavior that was a danger to self and others." At the time of her admission into the hospital, the mother threatened physical violence against her mother-in-law and exhibited "[p]sychiatric symptoms severe enough to cause disordered, bizarre behavior."

While the mother was hospitalized, the father filed a private deprivation petition alleging that S. D. H. was deprived as a result of the mother's mental health problems and uncontrolled behavior. The father also subsequently filed for divorce.

The mother was released from the hospital on April 6, 2006. An Air Force medical evaluation board thereafter examined whether the mother should be discharged from military service. In a consultation report submitted to the medical evaluation board, the mother's psychiatrist opined:

> Despite one year of aggressive medication treatment, individual and marital therapy, and use of both inpatient and [partial hospitalization] resources, the patient continues to report uncontrollable sadness and agitated anxiety of an unpredictable nature. . . . Prognosis is poor in the short term due to continued stressors that . . . may complicate her recovery. . . . The patient's clinical condition is unlikely to change substantively over the next 6-12 months.

Following its review, the medical evaluation board found that the mother suffered from major depressive disorder and borderline personality disorder and recommended that the mother be discharged from the Air Force. The mother subsequently was discharged from military service.

At the deprivation hearing, the mother's clinical psychologist testified about the mother's history of major depression, borderline personality disorder, and anger management problems. The mother's medical records also were admitted without objection. Additionally, the mother testified about her struggle with depression, admitted that she had an anger problem, and conceded that she had been physically violent with her husband during their marriage and had thrown furniture in the presence of her husband and S. D. H.

Following the deprivation hearing, the juvenile court entered its order finding that S. D. H. was deprived as to the mother, awarding temporary custody to the father, and authorizing the mother to have visitation with the child. The juvenile court found that the mother was unable to adequately care for S. D. H. based on her major depression, borderline personality disorder, and anger management problems, which had caused her to "exhibit[ ] erratic and paranoid behavior in the presence of the child" and to have trouble controlling

her extreme anger. The juvenile court further noted that during the deprivation hearing itself, the mother appeared to be angry, cried often, and had difficulty controlling her emotions. Thereafter, the juvenile court entered a disposition order finding that the child's deprivation could be cured and returning custody of S. D. H. to the mother, subject to her compliance with several conditions, including continuance of psychiatric counseling, maintenance of a medication regimen, and cooperation with home visits from a court appointed special advocate.[2]

On appeal, the mother challenges the juvenile court's findings of fact and conclusion of law that S. D. H. was deprived. While conceding that she suffers from a mental illness, the mother contends that there was no evidence showing that her mental illness affected her ability to parent S. D. H. In this respect, the mother emphasizes that her clinical psychologist, who testified at the hearing, specifically stated that she had not evaluated the mother's parenting abilities and could provide no opinion as to the mother's capacity as a parent. The mother also points out that she called several witnesses who testified that despite her mental illness, she was a good mother who always cared for S. D. H. and made sure that all of his needs were met. Finally, the mother stresses that neither her husband nor her mother-in-law testified to any specific instances in which she mistreated or neglected S. D. H.

Admittedly, the issue is a close one. Nevertheless, "it is the role of the juvenile court, not this Court, to weigh the evidence." (Citation omitted.) *In the Interest of J. B.*, 274 Ga. App. 564, 568 (618 SE2d 187) (2005). And, although the mother presented direct evidence in the form of witness testimony about her healthy interactions and ability to provide for S. D. H., the juvenile court was entitled to find that the direct evidence was inconsistent with, and ultimately disproved by, the strong circumstantial evidence presented by the father of the mother's inability to provide for the child. See generally *English v. Crenshaw Supply Co.*, 193 Ga. App. 354, 360-361 (3) (387 SE2d 628) (1989) (direct evidence can be disproved by inconsistent circumstantial evidence). Construed in the light most favorable to the juvenile

---

[2] The father argues that since custody of the child was returned to the mother, the appellate issue has become moot. We disagree. Since the case was not closed and the mother remains obligated to cure the deprivation finding by compliance with the court-imposed conditions in order to maintain custody of the child, the deprivation finding continues to be a justiciable issue that is subject to appellate review. See *In the Interest of A. B.*, 285 Ga. App. at 288-289 (appeal taken from order finding child to be deprived but allowing custody to remain with parent, subject to conditions and supervision in accordance with OCGA § 15-11-55 (a) (1)). Compare *In the Interest of I. S.*, 278 Ga. 859, 861-862 (607 SE2d 546) (2005) (deprivation finding was rendered moot when the children were returned to the parents and the case was closed).

court's finding of deprivation, there was sufficient evidence for the juvenile court to conclude that the child was deprived as to the mother.

A " '[d]eprived child' " is one who "[i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals." OCGA § 15-11-2 (8) (A). In deciding whether the child is without proper parental care and control, the juvenile court must consider whether there is "[a] medically verifiable deficiency of the parent's physical, mental, or emotional health of such duration or nature as to render the parent unable to provide adequately for the physical, mental, emotional, or moral condition and needs of the child." OCGA § 15-11-94 (b) (4) (B) (i). A finding of deprivation is authorized where there is evidence that the parent has been diagnosed with a mental illness, and where the parent's behavior and/or symptoms as a result of the illness reflect that he or she cannot adequately and safely care for the child. See *In the Interest of E. G.,* 284 Ga. App. 524, 528-529 (1) (b) (644 SE2d 339) (2007); *In the Interest of D. A. B.,* 281 Ga. App. 702, 703-704 (1) (b) (637 SE2d 102) (2006); *In the Interest of H. E. M. O.,* 281 Ga. App. 281, 285 (1) (b) (636 SE2d 47) (2006); *In the Interest of T. A.,* 279 Ga. App. 377, 379-380 (631 SE2d 399) (2006).

Here, the mother was diagnosed with major depression and borderline personality disorder and exhibited severe anger management problems. As a result of those conditions, the mother's behavior had become increasingly erratic and uncontrolled in the time leading up to the deprivation hearing. Indeed, over the course of the year before the hearing, the mother was twice partially hospitalized and then later fully hospitalized for a week in a mental health facility after she was unable to manage her angry outbursts. The mother's inability to control her anger also resulted in a military no-contact order and removal from weapons duty after the mother physically threatened another soldier. Likewise, the mother's failure to control her anger was evidenced by her hitting her husband during the March 31, 2006 meeting, as well as the mother's own concession that she had been physically violent with her husband during their marriage and had thrown furniture in the presence of her husband and S. D. H. Combined with this evidence of increasingly uncontrolled anger was the opinion offered by the mother's psychiatrist to the Air Force medical evaluation board that the mother's prognosis was poor for the next year.

Given the mother's trajectory of increasingly severe mental health problems resulting in repeated hospitalizations, her unpredictable, angry, and violent outbursts either directed at or committed in the presence of family members, and the mother's poor prognosis

for bringing her erratic behavior under control in the short term, the juvenile court was entitled to infer that S. D. H. was not safe in his mother's custody and could not be properly cared for by her at the time of the deprivation hearing. See, e.g., *In the Interest of D. L.*, 270 Ga. App. 847 (608 SE2d 311) (2004) (upholding termination of parental rights where mother could not safely and adequately care for her child, in light of her inability to control her explosive anger and violent behavior resulting from mental illness).[3] This inference was buttressed by the juvenile court's own first-hand observations of the mother's conduct and demeanor during the hearing. Under these circumstances, the juvenile court was authorized to find that S. D. H. was a deprived child.

*Judgment affirmed. Blackburn, P. J., and Ruffin, J., concur.*

DECIDED SEPTEMBER 28, 2007.

*Alex H. Morrow*, for appellant.

*Williams, Sammons & Sammons, Walter G. Sammons, Jr.*, for appellee.

---

[3] Arguing for reversal, the mother relies upon *In the Interest of C. C.*, 249 Ga. App. 101 (547 SE2d 738) (2001). In that case, we held that "the mere fact that a child is being cared for by someone other than a parent does not prove a lack of parental fitness" and concluded that a parent's hospitalization for mental health treatment, standing alone, does not justify a finding of deprivation. (Footnote omitted.) Id. at 104. In the present case, however, there was more than simply evidence that the mother had been hospitalized for mental illness to support the deprivation finding.